## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| KHALILAH JOHNSON, | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. SAG-17-1771 |
| | * | |
| UNITED PARCEL SERVICE, INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Khalilah Johnson ("Plaintiff") filed an Amended Complaint against her former employer, United Parcel Service, Inc. ("UPS"), alleging retaliation on the basis of religion, and hostile work environment. ECF 13. Discovery is now concluded. UPS filed a motion for summary judgment and Plaintiff filed a cross-motion for partial summary judgment. ECF 71, 72. I have reviewed those motions, along with the relevant exhibits, oppositions, and replies.[1] ECF 73, 88, 78. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, I will deny Plaintiff's Motion for Partial Summary Judgment, ECF 72, and grant Defendant's Motion for Summary Judgment, ECF 71.

---

[1] UPS filed a "Motion to Strike" portions of ECF 78, on the grounds that those portions constitute an impermissible surreply regarding UPS's Motion for Summary Judgment, instead of a permissible reply regarding Plaintiff's own dispositive motion. ECF 79. While, substantively, UPS is entirely correct, this Court is of the view that a motion to strike, in this context, is not the appropriate procedural vehicle. *See Dowdy v. Santander Consumer U.S.A., Inc.,* Civil No. SAG-19-01386, 2019 WL 5455554, at \*5 (D. Md. Oct. 14, 2019) (citing *Maxtena, Inc. v. Marks,* Civil No. DKC-11-0945, 2012 WL 113386 (D. Md. Jan. 12, 2012) for the proposition that the "Federal Rules of Civil Procedure only permit a motion to strike matters contained in pleadings, not those contained in other motions, brief, or attachments."). Although, typically, the appropriate course would be for the Court to disregard the improper arguments, in this case, the Court has considered Plaintiff's improper filing in its entirety. Thus, the Motion to Strike, ECF 78, will be denied.

## I.    FACTUAL BACKGROUND

The facts contained herein are taken in the light most favorable to Plaintiff, the non-moving party.[2]  Plaintiff began working for UPS in 2008 as a part-time package handler.  ECF 71-3 at 73:12-74-11.  She became a full-time driver, assigned to the Harbor Center in Baltimore, Maryland, in 2012. *Id.* at 80:12-14, 85:1–2.  The Harbor Center houses sixty to seventy full-time drivers who work sixty-five to seventy established delivery routes. *Id.* at 85:2-4; ECF 71-4 ¶ 2.  Routes are assigned to full-time drivers on the basis of seniority.  ECF 71-3 at 81:18-82:12.

The number and size of packages assigned to a route on a given day are determined by the customers' business needs and orders, in addition to UPS's efforts to balance its drivers' workloads. ECF 71-7 at 181:16-182:4 (describing "priority packages"). Package loads for each UPS truck are determined by the "Full-Time Package Dispatch Supervisor."  ECF 71-12 ¶¶ 3-4, ECF 71-11 ¶¶ 3-4. During the relevant period, those supervisors used a computer-guided system to formulate a "plan time" for each package load. ECF 71-11 ¶ 5 ("The plan time is calculated by a computer"). "Plan time" is the amount of time that UPS forecasts it will take a driver to finish his or her route on a particular day, following UPS's methods and procedures. *Id.* The package dispatch supervisors attempted to schedule each driver's "plan time" to take between 8 and 9.5 hours. *Id.* ¶¶ 5, 7.  The package dispatch supervisors determined the package load based on the route, and not based on which driver was assigned to the route on a given day, because they typically did not have that information. ECF 71-12 ¶ 11 (Declaration of Dispatch Supervisor stating "I typically did not know which cover drivers would be assigned to which route.").

---

[2] Technically, in evaluating Plaintiff's cross-motion for partial summary judgment, the facts should be viewed in the light most favorable to UPS, as the non-movant.  However, even viewing the facts in the light most favorable to Plaintiff, her claims cannot survive summary judgment.

After the packages to be delivered on a route were assigned by the package dispatch supervisors, the computer generated a plan determining where each package should be placed inside of the delivery truck, in order to maximize efficient delivery. ECF 71-9 ¶ 5; ECF 71-8 at 36:8-14.  Hourly employees known as "preloaders" or "loaders" load the packages onto the delivery trucks, in accordance with the computerized plans. ECF 71-9 ¶¶ 3, 5; ECF 71-5 at 28:6-19.

In January, 2015, Plaintiff bid on a specific route, 52C, and had sufficient seniority to win the bid. ECF 71-3 at 82:10-18.  She selected that route on the recommendation of Tony Freeman, a manager at the Harbor Center, without doing further research as to the route's requirements. *See id.* at 83:4-17.  On her first day of training on the route, Plaintiff learned that Route 52C was a bulk route, which means that it includes a number of UPS business customers who receive big, bulky items on a regular basis. ECF 71-6 at 22:10-23:7; ECF 71-7 at 83:9-84:14.

Years before Plaintiff was assigned to route 52C, she began alleging that she was subjected to extra work on her routes. Plaintiff testified that UPS began increasing the workload on her routes when the routes were assigned to her, as early as 2009 and 2010. ECF 71-3 at 138:23-141:5, 151:19-152:8.  Plaintiff alleged that in 2011 and 2012, she was assigned to the "worst route," *id.* at 182:7-183:23, and that her truck was loaded with extra work beginning no later than 2011. *Id.* at 125:18-25, 133:2-11.  On March 28, 2013, Plaintiff filed a grievance against UPS, alleging, "I have been overloaded in comparison to other employees." *Id.* at 141:14-25, 143:10-144:24; 146:6-35.

In May, 2013, Plaintiff requested a religious accommodation, to be allowed not to work past sundown on Fridays, to accommodate the start of her Sabbath as a then-practicing Seventh-

Day Adventist.[3] ECF 71-29. UPS granted Plaintiff's accommodation request, and allowed her not to work on Fridays between October 1 and April 1. ECF 73-3. The accommodation plan suggested that the months of the accommodation were based on "historical Almanac data," presumably referring to the expected time of sundown during those months. *Id.*

In 2014, Plaintiff sued UPS, alleging sex discrimination, race discrimination, failure to accommodate religious beliefs, and retaliation. *See Johnson v. UPS ("Johnson I"),* ECF 1, Civil No. RDB-14-4003. Her Amended Complaint in *Johnson I* alleged an "unsafe and overloaded truck." Civil No. RDB-14-4003, ECF 3 ¶ 134. At the summary judgment stage, Plaintiff's claims related to the amount of work she was assigned on five dates in 2013. *See* ECF 71-13 at 6 ("[T]he present action concerns her assignments on five separate occasions only: June 26, 2013; August 5, 2013; September 30, 2013; October 23, 2013; and December 2, 2013"). During the time she worked as a cover driver, Plaintiff claimed "that her assigned route was retaliatory because it was overloaded with packages." *Id.* at 7. The Court in *Johnson I* ruled that Plaintiff's claims about her workload in 2015 were not part of that case, due to her failure to exhaust administrative remedies as to those dates. *Id.* at 7 n.12. The Court granted summary judgment for UPS on Plaintiff's retaliation claim, ruling that Plaintiff had not established an adverse employment action, because assignment of an unreasonable workload on "[f]ive separate occasions over six months" would not "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 12. Further, the Court noted that the record showed that other drivers regularly performed more work than Plaintiff, and that UPS consistently sent other drivers to assist Plaintiff with her work on her heavier days. *Id.* Finally, the Court in *Johnson I* reasoned that, even if the unreasonable

---

[3] As of the date of her deposition, Plaintiff testified that she had become a self-described "Sabbath-keeping Christian" and no longer belonged to an organized church. ECF 71-7 at 17:15-22:25.

work assignments had been deemed to be adverse employment actions, "Plaintiff offers only conclusory allegations to show the existence of a causal connection" between her workload assignments and her religious accommodation.  *Id.*

Turning to the period at issue in this case, Plaintiff was out of work at UPS from March, 2014 through April 29, 2015, because of a work-related injury.  *See* ECF 71-7 at 90:8-92:9. She returned to work on April 29, 2015, and worked through June 1, 2015. *Id.* at 91:24-92:13. She sustained another work-related injury on or about June 1, 2015, which kept her out of work until July 20 or 21, 2015. *Id.* at 92:2-6. She returned to work for another nine or ten days before sustaining yet another work-related injury, and this time she was out of work for more than two years, returning in the late summer of 2017.  *Id.* at 92:14-18. When she returned in 2017, she worked from approximately mid-August through the beginning of November, before voluntarily resigning as part of the settlement of her workers' compensation claim.  *Id.* at 116:21-25, 103:5-10; *Id.* at 195:10-13.

On or about May 1, 2015, when Plaintiff first returned to work, she alleges that her new supervisor, Tom Reinhardt, made reference to the fact that she had sued the company. ECF 13 ¶ 2. According to Plaintiff's verified Amended Complaint, "After this conversation, Plaintiff's work truck began to be stuffed with overloaded packages that were dangerous to Plaintiff." *Id.* In fact, in a later report to UPS's Human Resources ("HR") Hotline, Plaintiff alleged, "On 5/14/2015, when JOHNSON came in, her truck was so overloaded that the door could barely close. JOHNSON informed Tom that the truck was packed high and wide.  JOHNSON said this is how she got hurt before, which is the reason she filed a lawsuit against UPS."  ECF 72-21 at 8 (case description). Johnson alleges that she experienced a "poorly packed, overstuffed, dangerous truck"

on "numerous days from May through July 30, 2015.  When I say numerous, I mean daily."  ECF 72-4 ¶ 4.

In her initial two days of training on Route 52C, during the week of May 8, 2015, Plaintiff delivered the route with a manager, Tony Freeman. ECF 71-7 at 243:11-19. The next day, she reported to do the route on her own, and the truck was loaded with more packages, and the route was scheduled for more stops, than it had been on the two training days. ECF 71-7 at 244:7-13. As noted above, Plaintiff continued to believe that her truck was overloaded, on the immediately ensuing dates.  *See generally* ECF 72-71 at 8.

On May 15, 2015, a Friday, Plaintiff's truck was loaded "lighter," but she still believed she would not finish the route in time for her Sabbath. ECF 13-4 at 9. She asked for assistance from her supervisors, and some packages were removed from her truck, but she was told that if she did not continue to work, she would be terminated because her accommodation only covered October through April.  *Id.*  As she delivered the packages, her truck door became stuck, and she was unable to complete her deliveries.  *Id.* Maintenance told her that they were sending another truck to her location. *Id.*  Plaintiff alleges that during this incident, one of her managers "expressed via text message to her their animus against Plaintiff's religious accommodation and practice."  ECF 13 ¶ 10A.  The text message in question reads, in its entirety, "Once your assigned work has been transferred to the new vehicle, you are instructed to deliver the rest of your stops."[4] ECF 13-3 at 2.  A mechanic arrived around 8 p.m. to provide Plaintiff with another truck. ECF 13-4 at 9. Because the sun was setting, Plaintiff returned to the warehouse without delivering the rest of the packages.  *Id.* When she returned to the warehouse, another supervisor, Tray, told her they would

---

[4] Even viewing this text in the light most favorable to Plaintiff, it makes no reference to religion or religious accommodation, and contains no evidence of "animus."  It simply directs her to complete her assigned duties, which Plaintiff alleges would have required work after the start of her Sabbath.

have to deal with the issue, but Plaintiff was unwilling to discuss business at that time, due to her religious observance. *Id.*

On May 19, 2015, Plaintiff telephoned the HR hotline to lodge a complaint of harassment. ECF 72-21 (case summary). The HR representative conducted an investigation, and held a follow-up meeting with Plaintiff on June 9, 2015. ECF 72-21 at 9. Once again, Plaintiff's allegations, as summarized in the case description, end with the events of May 15, 2015, despite the follow-up meeting occurring several weeks later. Any reference to Plaintiff's trucks being overloaded referred to dates prior to May 15, 2015. *See* ECF 72-21 at 8 ("On 5/7/2015, on her first day on the route by herself, JOHNSON started at 8:45 AM, and they placed over 30 extra stops with over 130 more pieces onto the route."); *see id.* ("on 5/12/2015, she was overloaded with work again, and she got off at 9:17 PM with help."); *see id.* ("On 5/13/2015, JOHNSON informed the Dispatcher, Name UNKNOWN, that he was giving her too much work."); *see id.* ("On 5/14/2015, when JOHNSON came in, her truck was so overloaded that the door could barely close.").

On May 21, 2015, Plaintiff filed a "Record of Grievance" with International Brotherhood of Teamsters (the "union"). ECF 72-17. The Record of Grievance describes the May 15, 2015 incident, and the conduct of Plaintiff's supervisors, in great detail. *See id.* It makes no reference to any subsequent overloading or dangerous loading of her trucks, or to any actions taken by Plaintiff's supervisors or co-workers after May 15, 2015. *Id.*

On June 4, 2015, Plaintiff called the HR hotline again to report that since her return to work in April, a manager, "Gary UNKNOWN," insisted that he could put packages weighing more than 100 pounds on her truck. ECF 71-15. She stated that she believed this conduct was "retaliation for filing complaints and grievances." *Id.* The retaliation issue she raised pertained only to the weight of certain packages on her truck, not to the way in which the packages had been loaded. *Id.*

7

Plaintiff claims she filed a complaint with the EEOC on June 12, 2015, ECF 13-4 at 12, but the only two EEOC charges in the Court record are from much later. On December 11, 2015 (months after Plaintiff stopped working as a result of her work-related injury in July, 2015), Plaintiff filed an EEOC charge which read:

> As of April 29, 2015, I have been subjected to unequal terms and conditions of employment, such as; I am given more route stops and packages than my male counterpart, along with being denied assistance when packages are over the required limited weight. When I complain or request help from my Manager Gary and Supervisors Tony and Tom, I am disciplined. On April 29, 2015 I requested religious accommodations, however, it was denied, which, has caused me to be disciplined.[5] Another male employee requested religious accommodations on the same day and his request was granted. I have made numerous complaints with Human Resources; however, my work environment has worsened.

ECF 6-8. On August 31, 2016 (again during her two-year period of leave for injury), Plaintiff filed another EEOC charge, which read:

> As of April 29, 2015 and continuing, I have been subjected to unequal terms and conditions of employment compared to my male counterparts. The unequal treatment has taken the form of additional route stops and packages being placed on me. When I complain about the unequal treatment from upper management, I am faced with unequal treatment in the form of having my work sabotaged, suspensions, written counseling's [sic] and threats of termination.

ECF 6-9. Neither charge made specific reference to packages being loaded onto Plaintiff's truck with intent to injure her.

In her filings in this case, Plaintiff has submitted photographic evidence that she describes as examples of the way her truck looked, as compared with other drivers' trucks, packed for delivery. *See, e.g.,* 72-4 ¶ 4; 72-5. She alleges that as a result of the dangerously packed trucks,

---

[5] The record before the Court does not reflect an April 29, 2015 request for religious accommodation, other than the accommodation from 2013 which remained in effect upon Plaintiff's return to active employment.

she was injured on June 1, 2015, and again on July 29, 2015. ECF 13-4 at 10, 13. She was injured

on the job once more in August, 2017. ECF 71-7 at 205:18-21. She testified, as confirmed by her

husband, who also works as a UPS driver, that co-workers' UPS trucks were packed "with regard

to driver safety and delivery efficiency." *See* ECF 72-6 (Michael Johnson affidavit "Plaintiff's

truck was very packed. The packages looked like they were tossed in and that was odd compared

to normal in my experience at UPS. Plaintiff's truck was looking disorganized and shabby

compared to my trucks and other trucks in the yard during this time . . . Her truck would be packed

front to back with boxes outside."); *see also* ECF 72-10 at 26–27 (testimony of Vernon Woodly[6],

looking at photo of Plaintiff's truck, "This is not typical. This is very bad. I'm looking at the

picture, no driver should go out like this. It does happen late in December where package cars go

out like this . . . This is a recipe for failure.").

In her verified Amended Complaint, Plaintiff alleges, "Supervisor Tom Reinhart created

extra work or extra write ups on Fridays so she might miss her Sabbath, to keep her at work late,

and he would impromptly [sic] schedule meetings on Friday afternoons with Plaintiff, to interfere

with Plaintiff's Sabboth [sic] accommodation." ECF 13 ¶13. However, at deposition, Plaintiff

acknowledged that she could not remember working past sundown on any Friday after 2012. *See*

ECF 71-3 at 352:6-12; *see also* ECF 71-7 at 279:15-16 ("I don't recall that I worked over on a

Friday in May [2015.]"). Corroborating the version of events Plaintiff described at her deposition,

her timeline of events makes no reference to any further incidents occurring on a Friday after the

---

[6] Woodly testified that he had worked at UPS as both a driver and a loader. ECF 72-11 at 7:5-19.
While at UPS, he asked for a religious accommodation to allow him to attend religious services
on Wednesday evenings, and it took several years for his request to be granted, after he had been
fired and reinstated several times for missing work on Wednesdays. *Id.* at 9:9-14:4. Woodly
identified the manager involved in decisionmaking about his case as "Charles." *Id.* UPS fired
Woodly in 2016, and he believes it was because of his religious accommodation, although UPS
cited his tardiness and poor attendance. *Id.* at 63:14-64:17.

initial incident on May 15, 2015, except for May 29, when Tom Reinhardt wanted her to sign paperwork at the end of the day, and she told him they would continue on Monday. ECF 13-4 at 10. On Monday, June 1, 2015, they were going to issue Plaintiff a one-day suspension for refusing to complete the paperwork on Friday, but instead she was injured and missed several weeks of work. *Id.* at 10-11.

Plaintiff also proffered affidavits from other employees who had worked at the Harbor Center, in addition to Woodly. One such employee, Bill Mercer, requested a religious accommodation to get off at 5 p.m. on Wednesday evenings to attend his religious services. ECF 72-12 ¶ 2. The request was denied. *Id.* ¶ 4. Shortly after the denial, Mercer experienced increased scrutiny from supervisors, he "started receiving write ups and employment discipline that lacked factual basis, and without corrective opportunities provided," and he was eventually fired. *Id.* ¶¶ 5, 6, 9, 10. His supervisors were not the same as Plaintiff's supervisors. *Id.* ¶ 6.[7] Mercer did not report an increased workload. *Id.*

Mark Allen was another UPS driver at the Harbor Center. ECF 72-13 ¶ 2. Prior to 2015, Allen had an informal agreement with his managers to allow him to leave early on Thursdays for his religious meetings. *Id.* ¶ 7. When a new regional manager, John Pinnock, took over at the Harbor Center, Allen made a formal written religious accommodation request, which was ignored. *Id.* ¶¶ 9, 10, 12. After the request, Allen testified that his workloads got heavier, and sometimes he missed his religious meetings. *Id.* ¶ 13, 15. Allen filed multiple grievances. *Id.* ¶¶16, 17. During that period, Allen stated that management started micro-managing him, and issuing discipline. *Id.* ¶ 19. His pay went up significantly due to his increased workloads, resulting in substantial

---

[7] Tony Freeman was one of Mercer's supervisors, *id.* ¶ 6, but did not directly supervise Plaintiff, although they did have some interaction. ECF 72-22, 72-23.

overtime. *Id.* ¶ 20. After John Pinnock left, the union told Allen that he could have two Thursdays off per month. *Id.* ¶ 24. Allen still has no written religious accommodation, but is permitted to make his meetings each week. *Id.* ¶ 28.

Plaintiff also alleges that in September, 2017, "Supervisor Tom Reinhart told Plaintiff when she had returned to UPS as a driver that he was resigning because the management 'wanted him to be a monster.'"[8] ECF 13 ¶ 23. Plaintiff signed a voluntary "Employee Separation Agreement" with UPS on November 3, 2017, in connection with resolution of her workers' compensation claim. ECF 71-26.

## II.   LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which

---

[8] Reinhart denies making the statement, though he admits dissatisfaction with management at the time of his resignation. ECF 71-8 at 54:13-21; 57-15-59-19. Even construing the facts in the light most favorable to Plaintiff and assuming the statement was made, it has no evident connection to Plaintiff's religious accommodation.

the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.    ANALYSIS

Plaintiff's Amended Complaint contains three Counts: (1) religious retaliation following protected activity of making complaints to UPS about its failure to honor her religious accommodation; (2) religious retaliation for requesting and enforcing a religious accommodation; and (3) hostile work environment. ECF 13.

### A.  UPS's Motion for Summary Judgment

#### 1. **Retaliation**

Counts One and Two, as currently framed, are closely related in terms of their allegations and will be addressed together.[9]  Title VII retaliation can be established by direct evidence, or by the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05 (1973). *Foster v. Univ. of Md. – E. Shore,* 787 F.3d 243, 249 (4th Cir. 2015), *abrogated on other grounds by Univ. of Texas Sw. Med. Ctr. v. Nassar,* 570 U.S. 338 (2013). Direct evidence "must demonstrate that an adverse employment action was actually due to [a protected activity] as opposed to some other lawful reason." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 205 (4th Cir. 2016) (citation omitted).  No direct evidence is present here.  Although Plaintiff suggests that her photographic evidence constitutes "direct evidence [that] can be read by a jury" ECF 72-1 at 13, at best, her photos depict heavily, sloppily loaded trucks.  Plaintiff did not adduce evidence as to which employees loaded her truck, in order to prove their retaliatory animus, and has no evidence of any supervisors directing anyone to overload her truck on the basis of her enforcement of her religious accommodation, or to retaliate for her complaints to UPS. Plaintiff contends that "a delivery company interested in efficiency by profit motive would not intentionally pack trucks like this." *Id.* However, the photos alone do not and cannot show motive.

Thus, in the absence of direct evidence, this Court must assess Plaintiff's claim under the *McDonnell Douglas* standards.  To survive summary judgment using that framework, "the plaintiff

---

[9] Count Two alleges religious retaliation for having a religious accommodation.  Plaintiff's accommodation was requested in March, 2013, more than two years before any of the alleged conduct in this case.  A mere request for accommodation is not a protected activity under Title VII.  Protected activity is defined as "oppos[ition] to any practice" or "participation in any manner in an investigation, proceeding, or hearing."  Section 3(a) of Title VII; *see also Laughlin v. Metro Wash. Airports Auth.,* 149 F.3d 253, 259 (4th Cir. 1998) ("Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinion in order to bring attention to an employer's discriminatory activities.").  This Court is viewing Count Two as a claim for retaliation for Plaintiff's enforcing her existing religious accommodation, which is almost identical to her claim, in Count One, of retaliation for her complaints to UPS about the infringement of her accommodation.

must first establish a *prima facie* case of retaliation, whereupon the burden shifts to the employer to establish a legitimate non-retaliatory reason for the action." *Price v. Thompson¸* 380 F.3d 209, 212 (4th Cir. 2004). If the employer proffers a legitimate, non-retaliatory explanation, "the plaintiff then must show that the employer's proffered reasons are pretextual or his claim will fail." *Id.* Pretext can be proven "by showing that the explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative" of retaliation. *Id.* In general, a *prima facie* case of retaliation requires proof (1) that the plaintiff engaged in protected activity; (2) that UPS took an adverse employment action against her; and (3) that there is a causal relationship between the protected activity and the adverse employment action. *Id.*

UPS does not dispute that Plaintiff engaged in protected activity when she complained, in May and June of 2015, that her religious accommodation was not being upheld. Those complaints consist of 1) her protestations to her managers on May 15, 2015, about their requirement that she continue delivering packages after sundown; 2) her telephone reports to the HR hotline on May 19, 2015 and June 4, 2015 (and her follow-up meetings with the HR representatives); 3) her union grievance on May 21, 2015, and 4) her subsequent EEOC charges.

The second element for a prima facie case is whether UPS took an adverse employment action against Plaintiff. The adverse action Plaintiff alleges, and on which she in fact seeks summary judgment, is that she was "subject to deliberately unsafe working conditions, which additionally, injured her twice." ECF 72 at 3. This Court assumes, without deciding, that dangerous overloading of a truck constitutes an adverse employment action,[10] because consistent

---

[10] The element of "dangerous packing" alleged in this case distinguishes this from the determination Judge Bennett made in *Johnson I*. Although, as noted above, the Amended Complaint in that suit made reference to an "unsafe and overloaded truck," Judge Bennett's opinion focused on "overloading" in terms of the amount of work assigned to Plaintiff, not the

exposure to intentional and dangerous overloading "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006).

Viewing all facts in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether the regular condition of Plaintiff's truck constituted "deliberately unsafe working conditions." Plaintiff's evidence includes: photographs, taken on unspecified dates and times, suggesting that her truck contains more bulky packages and is generally more disorganized than other drivers' trucks, *see, e.g.,* ECF 72-4 at 3-10; the testimony of Plaintiff and her husband regarding their observations of her trucks in comparison to the trucks of other drivers, both on her route and other routes, *see, e.g.,* ECF 72-4, 72-6; and the testimony of a former driver/loader, Woodly, describing the condition of her truck in a photograph as "very bad."[11] ECF 72-10 at 26–27.

However, UPS has adduced its own evidence suggesting that Plaintiff's truck was neither intentionally loaded in an irregular manner, nor "dangerous." UPS's evidence consists of (1) testimony that the number and size of packages on route 52C is attributable to Plaintiff's selection of a bulk route, (2) testimony regarding the manner in which packages are assigned to a truck and loaded into the truck, and (3) testimony from numerous supervisory employees that they receive regular complaints, from drivers on all sorts of routes, about the way in which their trucks are

---

assertion made in this case that boxes were loaded in the truck in a manner intentionally designed to cause injury. *See* ECF 71-21.

[11] Plaintiff also offers a transcript of a recorded statement from an unknown male stating, "That's a hazard," allegedly when viewing Plaintiff's packed truck. ECF 72-20. Plaintiff posits that the admittedly out-of-court statement would be admissible for its truth as an "excited utterance." Of course, the unknown speaker's degree of excitement cannot be ascertained from a written transcript. This Court need not reach the issue, because regardless of whether the statement is admissible or not, a genuine issue of material fact would remain, as noted above.

loaded. *See, e.g.* ECF 71-8 at 11:12–15 (T. Reinhart Depo.) ("I really did not feel like that anything

about her truck or her situation was any different from the other 80 drivers in the center."); *Id.* at

41:5-13 ("So I would say of the 80-something routes in the center, yeah, four or five a day would

have a problem like this that you'd be dealing with as far as bulk or volume issues, you know, and

52-C would be one of those routes where, you know, three days out of the week, you might be able

to see all the way to the front of the truck. Thursday or something, you might have no space, no

room, no breathing, you know."); ECF 71-9 ¶ 6 (Hatcher Aff.) ("It is not uncommon, especially

on a bulk route, for a package car to be fully packed or even for all of the packages assigned to a

route to not be able to fit on the package car … Once those packages have been delivered, there is

more room in the package car for the driver to move around.  Drivers other than Khalilah Johnson

complained about the number of packages loaded onto their package car and about the way in

which those packages were arranged in the package car.  These complaints were made on a fairly

regular basis."); ECF 71-10 ¶ 9 (Freeman Decl.) ("I regularly receive complaints from drivers

other than Khalilah Johnson that too much work has been assigned to their route.  Drivers other

than Khalilah Johnson also regularly complain that packages were loaded onto their trucks in a

disorganized or sloppy manner.  For example, cover driver Damian Mack, cover driver Luke

Otterbein, and bid driver David Atkinson have complained about how preloader Francisco Massey

loaded packages onto their trucks when they were assigned to Route 67C."); ECF 71-11 ¶ 11, 14

(Oxendine Decl.) ("During my tenure as Full-Time Package Dispatch Supervisor in the Harbor

Center, I have used the same methods and have considered the same factors in planning the loads

for Khalilah Johnson's bid route, Route 52C, when Khalilah Johnson is working that route as I do

for planning the loads for Route 52C when other drivers are assigned to that route . . . I usually

remove work from Route 52C, including on days when Khalilah Johnson has been running Route

52C, and assign it to a neighboring route in order to increase the neighboring route's stop count."). In light of the evidence adduced by UPS suggesting that Plaintiff's truck was loaded in an entirely standard manner, there is a genuine issue of material fact on the issue of whether Plaintiff can establish an adverse employment action, namely "deliberately unsafe working conditions."

Ultimately, though, Plaintiff's claim fails due to an utter lack of evidence to establish a causal connection between the condition of her trucks and her complaints of discriminatory conduct by UPS. Plaintiff contends that she "can establish causation of retaliatory motive by timing and, in addition, by similarly situated co-worker evidence." ECF 72-1 at 31. Although a plaintiff need not conclusively establish a causal connection to prevail on summary judgment, *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir. 1998), the plaintiff must offer evidence, not mere conclusory allegations, to support the existence of a causal connection. In many cases, that evidence does begin with showing close temporal proximity between the protected activity and the adverse employment action. *See, e.g.*, *Price v. Thompson,* 380 F.3d 209, 213 (4th Cir. 2004). Here, however, the timeline of events undermines, rather than supports, the notion that the alleged dangerous overloading had any connection to the complaints that Plaintiff made about her religious accommodation in May and June, 2015. Plaintiff's own timeline, as detailed above, reflects that she began alleging dangerous overloading as early as the first day she worked Route 52C on her own. For example, on May 14, 2015, the day before she engaged in her first protected activity related to this case, she complained to her supervisor that her truck was improperly packed, "and this is how she got hurt before." ECF 71-14 at 5. This is not a case in which the employer "takes adverse employment action against an employee *shortly after* learning of the protected activity." *Price*, 380 F.3d at 213 (emphasis added).

In addition to the fact that the timeline reflects that the alleged retaliatory conduct predated her protected activity, Plaintiff has no evidence to suggest that any preloaders or loaders had knowledge that she had engaged in any protected activity in May or June, 2015. In fact, Plaintiff's only testimony suggesting that any loader knew anything about her religious accommodation at all confirms that a loader, in 2017, offered to remove packages from her truck on a Friday. ECF 71-7 at 211:2-212:8. That evidence undercuts Plaintiff's unsupported suggestion that loaders operated in accordance with a managerial dictate to overload her trucks, to retaliate for her requested accommodation and subsequent complaints.

Other than her unsupported conclusory assertion that one can infer, from the allegedly improper packing, the loader's retaliatory intent, Plaintiff's proffered causation evidence rests solely on the experiences of other Harbor Center employees who requested religious accommodations. *See* ECF 72-1 at 31 ("Plaintiff can establish causation of retaliatory motive by timing and, in addition, by similarly situated co-worker evidence, under the third."). However, the experiences described by those employees bear little to no factual similarity to Plaintiff's alleged version of events, and accordingly do not support Plaintiff's claim of a causal connection. For example, Bill Mercer's religious accommodation, unlike Plaintiff's, was denied, and his supervisors were largely different than Plaintiff's. ECF 72-12. Mercer did not report any increased workload. *Id.* Mercer's affidavit does not suggest that his truck was "dangerously overloaded" in any manner. Similarly, Vernon Woodly also reported to different supervisors and managers. ECF 72-11. Like Mercer, Woodly's original religious accommodation request was denied. *Id.* Woodly also does not allege increased workload or dangerous overloading. *Id.* He was eventually fired for tardiness, though he subjectively attributes his firing to his request for a religious accommodation. *Id.*

18

Arguably, the situation closest to Plaintiff's is that of Mark Allen, who named Tom Reinhart as one of his supervisors. Unlike Plaintiff, Allen's original religious accommodation request was ignored for some time, and his workload got heavier, resulting in substantial overtime pay. ECF 77-1. Once Allen received his religious accommodation, his workload decreased on Thursdays, the date of his religious meeting. ECF 77-1 at 37:16-19. In fact, Allen himself opined that his situation had no relevance to Plaintiff's. *Id.* at 67:10-15 ("I know with my issue, it was with UPS and my religious accommodation, and that was three, four years ago and I was thinking, you know, I'm kind of irrelevant to what's going on now. Because I have my religious accommodation . . . "). In contrast, Plaintiff received her religious accommodation upon her initial request in 2013, and her complaints of a heavy and unfair workload long predated her religious accommodation request. Additionally, Allen concedes that he was compensated for any increased workload.

Ultimately, Plaintiff's subjective belief that the condition of her truck evidences intentional retaliation is not based on any factual predicate, and cannot defeat UPS's summary judgment motion. *See, e.g., Settle v. Balt. Cty.,* 34 F. Supp. 2d 969, 999 (D. Md. 1999) (finding Plaintiff's subjective belief that Defendant's action was racially motivated was insufficient, in the absence of articulable facts showing a "racial nexus"); *Vazquez v. Md. Port Admin.,* 937 F. Supp. 517, 522 (D. Md. 1995) ("Generalized testimony by an employee regarding [Plaintiff's] subjective belief that the adverse action was the result of discrimination is insufficient to make an issue for the jury."). Plaintiff has no evidence suggesting a causal link between the condition of her trucks and her protected activity or her religious accommodation, and summary judgment for UPS is therefore warranted.

## 2. **Hostile Work Environment**

19

In Count Three, Johnson alleges that UPS violated Title VII by subjecting her to a hostile work environment, which exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted). To establish a Title VII claim for a hostile work environment, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's [religion or protected activity]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.,* 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011) (alteration and internal quotation marks omitted). "If the harasser is a supervisor, then the employer may be either strictly or vicariously liable," depending on whether the harassment culminates in a tangible employment action. *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 333 (4th Cir. 2018). In contrast, harassment by a co-worker or a third-party, resulting in a hostile work environment, can be imputed to an employer only "if the employer knew or should have known of the harassment and failed 'to take prompt remedial action reasonably calculated to end the harassment.'" *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422-23 (4th Cir. 2014) (quoting *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir.1995)) (internal quotations omitted).

Initially, it is unclear that the type of conduct alleged by Plaintiff is properly described as "harassment." As noted above, the intentional overloading of a truck with intent to injure, in retaliation for protected activity, plausibly constitutes an adverse employment action for purposes of a retaliation claim. It is not, however, expressly connected in any factual way to Plaintiff's religion or her protected activity, such that it could be described as "severe or pervasive" or an

"abusive work environment." In fact, as a bid driver, Plaintiff spends almost all of her workdays on a truck by herself, without any co-workers or supervisors who could infect her work environment with harassing activity or abuse. Plaintiff does not allege, for example, that any of her supervisors or co-workers teased her, or made insulting remarks about her religion.

Even assuming, however, that the alleged dangerous overloading could constitute the type of "severe or pervasive" conduct required to establish a hostile work environment, Plaintiff lacks evidence to attribute the conduct to UPS. Plaintiff makes limited specific allegations about the involvement of her direct supervisor, Tom Reinhart. ECF 72-1 at 37 ("Plaintiff has identified Tom Reinhardt as one supervisor involved"). The fact that he directed her to complete her route on May 15, 2015, and on one subsequent occasion loaded some packages on her truck, could not amount to a hostile work environment. Plaintiff is unable to establish the identities of any other individuals responsible for the "dangerous overloading" that she alleges. As described above, however, she did not allege "dangerous overloading" or improper packing in any of the various complaints she lodged with UPS or the EEOC, leaving her unable to establish that "UPS knew or should have known of the harassment and failed 'to take prompt remedial action reasonably calculated to end the harassment.'" *Freeman*, 750 F.3d at 423. For all of those reasons, summary judgment for UPS is appropriate on Count III.

### B. Plaintiff's Motion for Partial Summary Judgment

Plaintiff's motion sought summary judgment on whether she had established an adverse employment action for purposes of her two retaliation counts, and whether she had established the fourth element of the hostile work environment claim, namely a factual basis to attribute the hostile work environment to UPS. For the reasons stated above justifying summary judgment for UPS, Plaintiff has not met her burden as to those elements, and her motion will be denied.

**CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment, ECF 71, will be GRANTED. Plaintiff's Cross-Motion for partial Summary Judgment, ECF 72, and Defendant's Motion to Strike, ECF 78, will be DENIED. A separate Order follows.


Dated: February 14, 2020                                             /s/
                                                        Stephanie A. Gallagher
                                                        United States District Judge